UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WILLIAM RANDOLPH KING,

                Petitioner,                Case No. 19-cv-10091
                                                Hon. Matthew F. Leitman

v.

THOMAS WINN,

                Respondent.
_____/

**OPINION AND ORDER (1) DENYING PETITION FOR WRIT OF HABEAS CORPUS (ECF No. 1), (2) DENYING A CERTIFICATE OF APPEALABILITY, AND (3) GRANTING PERMISSION TO APPEAL IN FORMA PAUPERIS**

Michigan prisoner William Randolph King has filed a *pro se* petition for a writ of habeas corpus under 28 U.S.C. § 2254. (*See* Pet., ECF No. 1.) In September 2016, a jury in the Wayne County Circuit Court convicted King of first-degree criminal sexual conduct, MICH. COMP. LAWS § 750.520b(1)(c), kidnapping, MICH. COMP. LAWS § 750.349, and third-degree criminal sexual, MICH. COMP. LAWS § 750.520d(1)(b). The state trial court then sentenced him as a fourth-time habitual felony offender to 40 to 75 years in prison for the first-degree criminal sexual conduct conviction and to lesser concurrent terms for the other convictions.

King raises three claims in his petition: (1) the prosecution withheld exculpatory evidence from the defense when it failed to timely submit a pubic hair

1

for DNA testing, (2) the trial court erred when it failed to instruct the jury to presume that test results on the pubic hair would have been unfavorable to the prosecution, and (3) the trial court incorrectly scored the sentencing guidelines and sentenced him in violation of the Eighth Amendment. (*See id.*)

The Court has carefully reviewed the petition and will deny relief because the Michigan Court of Appeals' adjudication of King's claims did not result in an unreasonable application of clearly established Supreme Court law. The Court will also deny King a certificate of appealability, but it will grant him permission to appeal *in forma pauperis*.

I

The charges against King arose from a cold-case sexual assault investigation. The complainant, Erin Long, flagged down police officers on August 5, 2005. She told them that she had just escaped from a van after being raped. Long was treated at a local hospital, and samples were taken for a rape kit. The rape kit was sent to the Detroit Police Department (the "DPD"), where it sat untested for almost ten years.

In 2015, the Michigan State Police (the "MSP") agreed to assist the DPD with its large backlog of untested rape kits. The MSP then sent Long's kit to a private firm, Bode Technology Group, for testing. Bode tested the kit, and the test produced a DNA profile for sperm cells found on Long's vaginal swab. The profile was sent back to the MSP, and the MSP then ran the DNA profile in the Federal Bureau of

2

Investigation's CODIS DNA database. The sample matched King's CODIS profile. Police subsequently obtained a known DNA sample from King, and it too matched the sperm sample from Long's rape kit.

At around this same time, a second lab technician investigating a different DPD case identified King as a match to a DNA sample taken from another complainant, Nichole McClintock. McClintock reported being raped by two men in Detroit on August 16, 2014. A foreign pubic hair was also found during McClintock's rape examination. That hair was not tested at that time because, unlike the sample that matched to King, it required more specialized mitochondrial DNA testing.

The prosecutor subsequently charged King with six counts of criminal sexual conduct and kidnapping with respect to Long's allegations. But the prosecutor did not charge King with assaulting McClintock. Instead, the prosecutor added McClintock as an other-acts witness in Long's case. The prosecutor's theory was that in both cases, King demonstrated a common scheme or plan by targeting vulnerable young women found in public places who were drug abusers. The defense theory, on the other hand, was that both Long and McClintock were sex workers. King claimed that he paid Long for consensual sex and that he and he and his son had consensual sex with McClintock.

Prior to trial, the prosecution disclosed to the defense the existence of the foreign pubic hair that was found in McClintock's rape kit. King's counsel then asked the trial court to order a lab to conduct a "forensic evaluation" of the hair on the basis that the results of that test may be "exculpatory evidence." (ECF No. 9-12, PageID.361.) The prosecutor told the court that it was her belief that the hair had already been submitted for testing, but because the MSP did not have the capability to conduct the test itself, the hair had to be sent to the FBI. And the prosecutor did not know how long it would take to conduct the test. The prosecutor further argued that, in any event, the test results would not be exculpatory because McClintock had reported being raped by two men, and thus a pubic hair from a second man would not exonerate King. The court did not believe that the hair evidence was "relevant," but it nonetheless instructed the prosecutor to "find out" whether the lab had completed its testing of the hair. (*Id.*, PageID.363.) It appears that the court later entered an order requiring that the hair be tested. (*See* ECF No. 9-13, PageID.374.)

On the first morning of trial, the prosecution provided to defense counsel a report from the MSP that the pubic hair had still not been tested. Defense counsel then moved to exclude McClintock's other-acts testimony due to the failure to test the hair as the court had previously ordered. The prosecutor responded that the hair had been sent out to be tested, but the testing had not yet been completed. The trial court denied King's motion to exclude McClintock's testimony, and it indicated its

4

intention to proceed with trial that day. (*See id.*, PageID.373-376.) The following morning, King requested a jury instruction directing the jury to presume that the testing of the hair would have been unfavorable to the prosecution, and the trial court denied that request. (*See* ECF No. 9-14, PageID.518-520.)

At trial, Long testified that on August 5, 2005, King forcibly sexually assaulted her multiple times after she accepted a ride in his van. Long explained that she only agreed to the ride because there was another woman inside the van. King then dropped that woman off at a store, drove Long to a secluded spot at a gas station, and forcibly raped her.

After this alleged assault, King picked up several other men. They drove to an industrial area of Detroit where King and the other men stole copper piping from a building. Long testified that King then sexually assaulted her a second time in a residential neighborhood while the other men unloaded the stolen materials. King suggested that all of the other men would be given a turn with Long, and Long ran from the van. She flagged down police officers, and the officers drove Long to Detroit Receiving Hospital, where the rape kit was performed.

An MSP lab technician testified to the process that led to King being identified as the man who assaulted Long through DNA testing.

McClintock testified that she was raped by two unknown men on August 16, 2014. She said that her mother dropped her off that morning at a friend's house in

Pontiac while she (McClintock) was detoxing from a heroin addiction. The friend gave her a pill to help her with withdrawal symptoms, and McClintock fell asleep. The next thing McClintock knew, she woke up on a couch in a house in Detroit. The house was full of people. Two men, an older man and a younger man, took McClintock into a bedroom where they raped her. They then drove her to a commercial street and dropped her off. McClintock called her mother who drove her to a hospital where a rape kit was performed. While McClintock was able to describe the assault, she did not identify King as one of the men that raped her. The jury was told that King had been connected to the McClintock assault by the DNA testing described above conducted by the second lab technician.

    King testified in his own defense. He said that he frequently did business with prostitutes, and that he would compensate them with money and drugs in exchange for sex. He admitted to having sex with both Long and McClintock. He said the sex in both cases was consensual. He testified that he paid Long forty dollars for sex. He then testified that he and his son picked up McClintock on the street, had sex, and later dropped her off. He denied being at a house in Detroit with lots of people, and he suggested that the alleged assault that McClintock described might have occurred after he and his son dropped her off. King's son, however, did not testify to corroborate King's story.

The jury found King guilty of two counts of criminal sexual conduct and kidnapping.

Prior to sentencing, the prosecutor received the results of the DNA analysis performed on the foreign pubic hair found during McClintock's rape examination. Those results showed that the hair belonged to a man named Ronald Lydiel Topps. Topps did not have any other connection to Long's trial or King's conviction. At the sentencing hearing, the prosecutor gave King's counsel a copy of the test results showing that the hair belonged to Topps. King's counsel then indicated that he planned to file a motion for new trial based on this new evidence, but it does not appear that one was ever filed.

King filed a claim of appeal in the Michigan Court of Appeals. His brief on appeal, filed by his appellate counsel, raised three claims:

> I. Mr. King was denied due process when potentially exculpatory evidence, which supported his theory of the case, was not produced before or during trial.
>
> II. Mr. King was entitled to have the jury given a negative inference instruction regarding the material the government had in its possession for years, but failed to test.
>
> III. Defendant-appellant is entitled to be resentenced as his current sentence is contrary to Const 1963, art 1, § 16, and his guidelines were incorrectly scored.

The Michigan Court of Appeals affirmed King's conviction in an unpublished opinion. *See People v. King*, 2018 WL 1972792 (Mich. Ct. App. Apr. 26, 2018).

King subsequently filed an application for leave to appeal in the Michigan Supreme Court raising the same claims that he raised in the Michigan Court of Appeals. The Michigan Supreme Court denied the application in a standard form order. *See People v. King*, 919 N.W.2d 58 (Mich. 2018) (Table).

## II

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") requires federal courts to uphold state court adjudications on the merits unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

## III

### A

King first asserts that the prosecution violated his due process rights under the Supreme Court's decision in *Brady v. Maryland*, 373 U.S. 83 (1963), when it withheld exculpatory evidence by failing to timely submit the pubic hair found during McClintock's rape kit for DNA testing. In *Brady*, the Supreme Court held

8

that the state has a duty to disclose exculpatory evidence to the defense under the Due Process Clause. "There are three components to a *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). King asserts that because the hair was later identified as belonging to a Topps, and *not* his son, the test result supported his trial defense that McClintock may have been raped by two men after he and his son had consensual sex with her.

The Michigan Court of Appeals considered this claim on direct review and rejected it:

> [P]rior to trial, defendant asked the trial court to order the lab to complete DNA testing on a pubic hair that was found in the prior victim's underwear or vaginal opening during the rape kit collection. At that time, the prosecution had already submitted the hair for testing to the lab, but the testing had not yet been completed. Defense counsel acknowledged this and conceded that the prosecutor had not acted in bad faith—the order sought would only have compelled the lab to complete its work. Further, defendant's DNA was found inside the prior victim's vagina. Although the trial court questioned the relevancy of the test, which is understandable due to the prior victim's assertion that two men had assaulted her and that defendant's DNA already had been found in her, the trial court nonetheless ordered the lab to complete the testing.
>
> Immediately before trial, the prosecution acknowledged that the testing was not then complete. The trial court ruled

9

that it would proceed with trial, despite the results being unavailable. In the alternative, defendant moved to exclude the prior victim's testimony considering the results were not available; however, the trial court denied this request, acknowledging that the issue related to admissibility of the other acts had been previously decided. After trial and during sentencing, the prosecution provided defendant with the final results of the pubic hair testing, which identified it as belonging to a person other than defendant.

First, the prosecution did not suppress evidence, and defendant was not denied due process. It is undisputed that the prosecution did not possess any test results until after trial. As a result, it is clear that the prosecution did not possess and suppress any evidence that was favorable to defendant. At the time of trial, the prosecution had disclosed the existence of the pubic hair, which was all the prosecution had available to it. Moreover, there was no evidence that the prosecution engaged in any misconduct or bad faith by delaying having the hair tested. Indeed, defendant acknowledged at the time that the prosecution was not acting in bad faith. Accordingly, defendant's due-process challenge fails. See also *People v. Coy*, 258 Mich. App. 1, 21 (2003) ("Absent a showing of suppression of evidence, intentional misconduct, or bad faith, the prosecutor and the police are not required to test evidence to accord a defendant due process.").

Defendant has also failed to prove the second and third prongs of the *Brady* requirements—that the evidence was favorable to his defense and there was a reasonable probability that there would have been a different outcome had the evidence been presented. *Chenault*, 495 Mich. at 150. Importantly, notwithstanding the additional contributor, defendant's DNA was still found in the prior victim's vagina. The prior victim testified that two men had raped her, so the identification of an additional subject only served to corroborate her testimony. Defendant merely contends that he may have been able to attack the

10

> prior victim's credibility during cross-examination had he had the information; however, as the prior victim had already established a second party to the rape, we are unable to glean any additional facts that would have allowed her to be further challenged had the evidence been available to defendant. Lastly, defendant contends that he could have "possibly uncovered information consistent with [his] defense" had he been provided with the results. This general statement does not meet his burden to demonstrate that it was reasonably probable that, had he had the results, the outcome of the trial would have been different. Accordingly, we hold that defendant is not entitled to any relief.

*King*, 2018 WL 1972792, at ** 1-2.

The Michigan Court of Appeals' decision was not contrary to, or an unreasonable application of, clearly established federal law. It was not unreasonable for the state appellate court to conclude that the prosecutor did not violate *Brady* because the only the evidence that the prosecutor had at the time of trial – that a foreign hair was recovered from McClintock's rape kit – was disclosed to the defense. Evidence that the hair belonged to Topps was not suppressed because that evidence did not exist at the time of trial. And when the test results on the hair came back and revealed that the hair belonged to Topps, that evidence was also disclosed to the defense. Moreover, King has not cited any clearly established Supreme Court law that under these circumstances, a prosecutor had a duty to test the hair at issue any sooner than the prosecution did. Finally, King has not shown that the Michigan Court of Appeals' unreasonably concluded that the prosecution did not act in bad

11

faith. Indeed, King's own counsel stated on the record that the prosecution did not act in bad faith with respect to the testing of the hair.

For all of these reasons, King is not entitled to federal habeas relief on this claim.

**B**

King next asserts that the trial court erred when it failed to instruct the jury that it should presume that the DNA testing on the pubic hair would have been unfavorable to the prosecution. The Michigan Court of Appeals considered this claim on direct review and rejected it:

> Defendant argues that because the prosecution failed to test and provide the results of all of the DNA evidence from the prior victim's rape kit, the trial court erred when it failed to provide a negative inference jury instruction. We disagree. "Jury instructions that involve questions of law are also reviewed de novo." *People v. Gillis*, 474 Mich. 105, 113; 712 N.W.2d 419 (2006). However, "a trial court's determination whether a jury instruction is applicable to the facts of the case is reviewed for an abuse of discretion." *Id.*
>
> A criminal defendant has the right to have a properly instructed jury consider the evidence against him. *People v. Wood*, 307 Mich. App. 485, 519; 862 N.W.2d 7 (2014), vacated in part on other grounds 498 Mich. 914 (2015). "This Court reviews jury instructions as a whole to determine whether error requiring reversal occurred." Id. "The jury instructions must include all elements of the charged offenses, and must not omit material issues, defenses, or theories that the evidence supports." *Id.*

> "Michigan courts have long recognized that when material evidence in control of a party is not produced at trial, the opposing party is entitled to an adverse inference instruction." *People v. Cress*, 250 Mich. App. 110, 157 n.27; 645 N.W.2d 669 (2002), rev'd on other grounds 468 Mich. 678 (2003). An adverse inference instruction allows the jury to infer that the evidence, although not presented at trial, would have been not favorable to the party who was supposed to present the evidence. *See, e.g.*, M Crim JI 5.12 (instruction that permits the jury to infer that a missing witness would have testified unfavorably to the prosecution when the prosecution was responsible for producing the witness). However, such an instruction is only permitted when the prosecutor acts in bad faith. *Cress*, 250 Mich. App. at 157–158; *People v. Davis*, 199 Mich. App. 502, 514–15; 503 N.W.2d 457 (1993), overruled on other grounds by *People v. Grissom*, 492 Mich. 296 (2012). As stated above, there was no evidence to show that the prosecution acted in bad faith when it did not produce the testing results by the time of trial. Accordingly, the trial court did not err when it declined to provide the adverse inference instruction to the jury.

*King*, 2018 WL 1972792, at ** 2-3.

The Michigan Court of Appeals' decision was not contrary to, or an unreasonable application of, clearly established federal law. For the reasons discussed above, the state court did not unreasonably conclude that the prosecution did not act in bad faith when it failed to have the hair tested earlier than it did. And King has not identified any clearly established Supreme Court precedent that entitled him to an adverse inference instruction under these circumstances.

For all of these reasons, King is not entitled to federal habeas relief on this claim.

## C

Finally, King makes two arguments with respect his sentence. He primarily argues that the state trial court incorrectly scored the sentencing guideline offense variables. But King's claim that the state-court incorrectly scored the guidelines is not cognizable on federal habeas review. *See Howard v. White*, 76 F. App'x 52, 53 (6th Cir. 2003) ("A state court's alleged misinterpretation of state sentencing guidelines and crediting statutes is a matter of state concern only" and "federal habeas corpus relief does not lie for errors of state law").

King also argues that his sentence violates the Eighth Amendment. The Michigan Court of Appeals considered this claim on direct review and rejected it:

> Defendant contends that his sentence is cruel or unusual because the term exceeds his natural life expectancy, and thus, the sentence equates to a life sentence without parole, and the trial court failed to consider mitigating factors. We disagree.
>
> A defendant must "advance a claim below that his sentences were unconstitutionally cruel or unusual" to be preserved. [*People v. Bowling*, 299 Mich. App.] at 557. Defendant failed to object during sentencing that his sentence was cruel or unusual; therefore, the issue is unpreserved. *See Id*. Accordingly, we review this unpreserved constitutional issue for plain error affecting defendant's substantial rights. *Id*.
>
> The United States Constitution prohibits cruel and unusual punishment, U.S. Const. Am. VIII, while the Michigan Constitution prohibits cruel or unusual punishment, Const. 1963, art. 1 § 16. Thus, Michigan's Constitution affords more protection than the United States Constitution. *See*

14

*People v. Benton*, 294 Mich. App. 191, 204; 817 N.W.2d 599 (2011). In other words, "[i]f a punishment passes muster under the state constitution, then it necessarily passes muster under the federal constitution." *Id.* (quotation marks and citation omitted). "In deciding if punishment is cruel or unusual, this Court looks to the gravity of the offense and the harshness of the penalty, comparing the punishment to the penalty imposed for other crimes in this state, as well as the penalty imposed for the same crime in other states." *Bowling*, 299 Mich. App. at 557–558. Explained another way, a sentence constitutes cruel or unusual punishment when it is grossly disproportionate to the seriousness of the circumstances surrounding the offense and the offender. *People v. Bullock*, 440 Mich. 15, 32; 485 N.W.2d 866 (1992); *People v. Milbourn*, 435 Mich. 630, 636; 461 N.W.2d 1 (1990). Further, "a sentence within the guidelines range is presumptively proportionate, and a sentence that is proportionate is not cruel or unusual punishment." *People v. Powell*, 278 Mich. App. 318, 323; 750 N.W.2d 607 (2008) (citations omitted).

Here, defendant was sentenced to a minimum term of imprisonment of 40 years, or 480 months. His guidelines range for his minimum sentence was 270 to 900 months. Thus, defendant was sentenced within the guidelines range, which makes his sentence presumptively proportionate and not cruel or unusual. Nothing in the record negates the presumption of proportionality, as defendant's sentence was proportionate to the seriousness of circumstances surrounding the offense and the offender. Defendant contends that his sentence is cruel or unusual because he will likely die before being eligible for parole. However, defendant incorrectly assumes that he is entitled to parole. *See People v. Merriweather*, 447 Mich. 799, 808; 527 N.W.2d 460 (1994) (stating that Michigan law does not support the contention that all defendants are entitled to parole); *Bowling*, 299 Mich. App. at 558. Furthermore, a defendant's age is insufficient to overcome the presumptive proportionality of his sentences,

15

> especially when considering a defendant's "lengthy criminal record and the gravity of his offenses." *Bowling*, 299 Mich. App. at 558–559. Here, there is no question that the offense of CSC–I "is a serious offense." *People v. Fultz*, 453 Mich. 937; 554 N.W.2d 725 (1996). Considering this particular case, the offense was horrific. Defendant repeatedly sexually assaulted the victim over many hours, keeping her confined in his van. He told the victim that after he assaulted her one more time, he was going to allow the other men to get their "turn," which reasonably made the victim believe she was going to be gang raped. And considering the offender, defendant had a very extensive history, including 15 convictions, of which at least nine were felonies, including assault with a deadly weapon, carrying a concealed weapon, and a federal weapons conviction.
>
> Moreover, we note that defendant also has failed to show that his sentences are cruel or unusual compared to the penalties imposed for other crimes in this state or for the same crimes in other states. *Bowling*, 299 Mich. App. at 559, citing *People v. Brown*, 294 Mich. App. 377, 390; 811 N.W.2d 531 (2011); *see also People v. Masroor*, 313 Mich. App. 358, 400; 880 N.W.2d 812 (2015), aff'd in part and rev'd in part on other grounds *People v. Steanhouse*, 500 Mich. 453 (2017).

*King*, 2018 WL 1972792, at ** 5-6.

King has not shown that the Michigan Court of Appeals' decision was contrary to, or an unreasonable application of, clearly established federal law. Indeed, King has not even attempted to show how the Michigan court's analysis or conclusion contravenes any decision issued by the United States Supreme Court, nor has he tried to show how any United States Supreme Court decision compels relief

from his sentence. Under these circumstances, King is not entitled to habeas relief on his Eighth Amendment claim.

As none of King's claims merit relief, the Court will deny his petition.

## IV

In order to appeal the Court's decision, King must obtain a certificate of appealability. To obtain a certificate of appealability, a habeas petitioner must make a substantial showing of the denial of a constitutional right. *See* 28 U.S.C. § 2253(c)(2). To demonstrate this denial, the petitioner is required to show that reasonable jurists could debate whether the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. *See Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000). Here, jurists of reason would not debate the Court's conclusion that King has failed to demonstrate entitlement to habeas relief with respect to each of his claims. Therefore, the Court will deny King a certificate of appealability.

The standard for granting an application for leave to proceed *in forma pauperis* on appeal is a lower standard than the standard for a certificate of appealability. *See Foster v. Ludwick*, 208 F.Supp.2d 750, 764 (E.D. Mich. 2002) (citing *United States v. Youngblood*, 116 F.3d 1113, 1115 (5th Cir. 1997)). While a certificate of appealability may only be granted if a petitioner makes a substantial showing of the denial of a constitutional right, a court may grant *in forma pauperis*

Case 4:19-cv-10091-MFL-EAS ECF No. 11 filed 04/22/20 PageID.1290 Page 18 of 18

status on appeal if it finds that an appeal is being taken in good faith. *See id*. at 764-765; 28 U.S.C. § 1915(a)(3); Fed. R. App. 24(a).

Here, the Court concludes that an appeal could be taken in good faith. King may therefore proceed *in forma pauperis* on appeal.

**V**

For the reasons set forth above, the Court **DENIES** King's petition for writ of habeas corpus (ECF No. 1).

The Court further **DENIES** King a certificate of appealability, but it **GRANTS** him leave to appeal *in forma pauperis*.

**IT IS SO ORDERED**.

Dated: April 22, 2020

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on April 22, 2020, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(810) 341-9764

18